UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____x

ALBERT DOERBECKER, ADMINISTRATOR OF      No. 12 Civ. 2204 (LDW)
THE ESTATE OF KURT DOERBECKER;
ALBERT DOERBECKER; and MARIE      **SECOND AMENDED**
DOERBECKER,      **COMPLAINT AND JURY**
     **DEMAND**

               Plaintiffs,

          -against-

COUNTY OF NASSAU; POLICE OFFICER
SHEVACH BERKOVITS; SGT. NICHOLAS
STILLMAN; SGT. JACQUELINE LEWIS;
LT. JOHN KELLY; SGT. JOHN HERMANN;
POLICE OFFICER EDWARD CARLSON;
POLICE OFFICER ADAM WOR; POLICE
OFFICER ROBERT GAROFALO; POLICE
OFFICER JARED BARRETTI; POLICE OFFICER
KRYSTAL DELUCA; AND JANE AND JOHN
DOES 1-10,

              Defendants.
_____x

     Plaintiffs Albert Doerbecker, Administrator of the Estate of Kurt Doerbecker, Albert

Doerbecker, and Marie Doerbecker, by and through their attorneys, Cuti Hecker Wang LLP, for

their Complaint hereby allege as follows:

<u>**NATURE OF THE ACTION**</u>

     1.      This civil rights action arises out of the excessive, militaristic siege of the

Doerbecker home by the Nassau County Police Department ("NCPD") during the early morning

hours of August 30, 2011, a day after Hurricane Irene swept over the sleepy village of Point

Lookout, New York where the Plaintiffs have long lived.  The NCPD's grossly disproportionate

1

response proximately caused the tragedy at the core of this lawsuit:  the wrongful killing of a frightened, fleeing, unarmed, five-and-a-half-foot-tall, 145-pound, 23-year-old Kurt Doerbecker by an NCPD officer who fired twice and missed before finally fatally shooting Kurt in the back of the head.

  2. This case also concerns the false arrests and police abuse of Mr. and Mrs. Doerbecker, who tried in vain that fateful morning to appease the belligerent commander of the poorly trained, over-tired, and overzealous force – including a Bureau of Special Operations ("BSO") team (a heavily armored, SWAT-like unit), a canine unit, numerous other vehicles and officers (some using night vision goggles and wielding high-intensity lamps that they shined through the home's windows), and even a police boat patrolling the channel behind the family's home – that the NCPD unleashed upon the Doerbeckers, all to investigate relatively minor offenses that they apparently suspected Kurt of committing, even though the NCPD knew Kurt was at home, with his family, and sleeping when they arrived, and thus that there was no reason to believe that, if they had probable cause to arrest him, they could not simply secure a warrant and do so peaceably in the morning.  Yet the NCPD decided to lay siege to the home, and they wrongfully killed Kurt Doerbecker, a star athlete and promising young man.

  3. The NCPD used stealth as well as overwhelming force.  The NCPD kept Mr. and Mrs. Doerbecker on their front stoop – where they were when, unbeknownst to them, the NCPD killed Kurt on or near the beach in their backyard – and then they falsely and with the use of excessive force arrested each of them and hurried them away to separate squad cars.   This surprise and baseless detention prevented Mr. and Mrs. Doerbecker from being able to notice – and therefore stop or at least question – the member or members of the NCPD who snuck into their home from the backyard minutes after Kurt had been shot.  Indeed, the Doerbeckers had no

idea that the police were in the home at that time.  Instead, Mr. and Mrs. Doerbecker sat alone in squad cars, handcuffed and in pain, left to wait for hours to wonder what was going on while the child they had raised lay dead on the beach in their backyard.

4.     The NCPD – no doubt scrambling for a cover story to attempt to justify this wrongful shooting – waited for almost four hours to tell Mr. or Mrs. Doerbecker anything about the "reason" for the siege, finally dragging the confused, alarmed, exhausted couple they had kept apart for hours into a mobile command unit at approximately 5:30 am to tell them Kurt was dead.  They never mentioned that at least one officer was in the house, near the kitchen, moments *after* the shooting, or what that officer was doing there.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.SC. §§ 1331, 1343(a), and 1367.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

7.     Plaintiff the Estate of Kurt Doerbecker (the "Estate") is the entity authorized by law to pursue claims related to Kurt's wrongful death; the Estate is authorized to commence this suit by its court-appointed administrator, Kurt's father, Albert Doerbecker in whose name in that capacity it is commenced.

8.     Plaintiff Albert Doerbecker resides at 165 Bayside Drive, Point Lookout, New York.

9.     Plaintiff Marie Doerbecker resides at 165 Bayside Drive, Point Lookout, New York.

10.     Defendant Nassau County was and is a municipality that is a political subdivision of the State of New York.  At all times relevant hereto, defendant Nassau County, acting through

the NCPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NCPD matters and was responsible for the appointment, training, supervision, and conduct of all NCPD personnel, including the defendants referenced herein.  In addition, at all relevant times, Nassau County was responsible for enforcing the rules of the NCPD, and for ensuring that NCPD personnel obey the laws of the United States and State of New York.

11.     At all times relevant hereto, Police Officer Shevach Berkovits was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

12.     At all times relevant hereto, Sgt. Nicholas Stillman was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

13.     At all times relevant hereto, Sgt. Jacqueline Lewis was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of her employment as such.

14.     At all times relevant hereto, Lt. John Kelly was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

15.     At all times relevant hereto, Sgt. John Hermann was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

16.     At all times relevant hereto, Officer Edward Carlson was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

4

17.     At all times relevant hereto, Officer Adam Wor was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

18.     At all times relevant hereto, Officer Robert Garofalo was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

19.     At all times relevant hereto, Officer Jared Barretti was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of his employment as such.

20.     At all times relevant hereto, Officer Krystal Deluca was a police officer employed by the NCPD, acting in the capacity of agent, servant and employee of defendant Nassau County, and within the scope of her employment as such.

**JURY DEMAND**

21.     Plaintiffs hereby demand a trial by jury on all of their claims in this action.

**FACTUAL ALLEGATIONS**

A.     **Background**

22.     In late August 2011, Nassau officials became aware of a massive hurricane moving up the Atlantic Coast, the storm surge of which was predicted to create a grave risk of life-threatening flooding and other damage ("Hurricane Irene").

23.     On Friday, August 26, 2011, the County issued a voluntary evacuation notice in light of approaching Hurricane Irene.

24.     The County did not have sufficient police personnel to respond adequately to the threat posed by Hurricane Irene; instead, on information and belief, the County required the NCPD to have officers serve extended shifts and/or back-to-back shifts.

25.     Hurricane Irene made landfall in Point Lookout in the early morning hours of August 28, 2011.  By 8:30 pm that Sunday, hundreds of thousands of Long Island residents were without electricity.

26.     The damage caused by Hurricane Irene placed enormous institutional pressure on the NCPD.  As a result of its attempts to manage the crisis, officers of the NCPD – including, on information and belief, officers who responded to Kurt's home on the occasion when he was shot and killed – were inadequately rested and inadequately trained with respect to the use of force during such circumstances.

**B.      Monday Evening, August 29, 2011 – Kurt and Nick Castellano Apparently Fight About a Girl**

27.     At approximately 6:30 pm, Mr. Doerbecker returned home from work to his home at 165 Bayside Drive in Point Lookout, New York.

28.     The home is on a 40x100 foot lot, and the rear of the property looks out on a small navigable channel.  The home has two main levels and a basement level.  The main floor contains a full bath near the front door, a kitchen, a dining area, a living room area, and two other rooms used either as bedrooms or as a recreation room for the children.  The rear wall of the main floor is comprised mainly of sliding glass doors that open onto a deck (and that deck has stairs that lead down to a patio below).  The upper story contains the master bedroom and master bathroom.  It too has a deck that is accessed by walking through sliding glass doors, but it has no steps or other means of access to the ground.  The basement level contains a garage, and two

6

small rooms used as bedrooms, one of which was Kurt's room, and the other which was

occupied that summer by Mrs. Doerbecker's then-86-year-old mother.

29.     The family likely had dinner at about 7:00 pm.

30.     Thereafter, Mr. and Mrs. Doerbecker were likely watching television in their

living room.  They likely were doing so in the company of Mrs. Doerbecker's elderly mother,

who was staying with the family that summer.

31.     Their two sons – Kurt and Albert III – were in and out of the house.  It was a

summer evening, and no one was paying particular attention to what, if anything, the boys were

doing.

32.     On information and belief, Kurt and Nick Castellano (a young man also from

Point Lookout who knew Kurt) apparently had been in a dispute regarding a woman.

33.     At or around 9:00 pm on August 29, 2011, Castellano and an unidentified male

arrived and stood in front of the Doerbecker home at 165 Bayside Drive.  Castellano yelled for

Kurt to come out and fight.  Kurt said that he did not want to come outside.  Instead, Mr.

Doerbecker went to the front stoop and asked Castellano and his companion to leave.  They did.

34.     On information and belief, at or around this time, Kurt walked to the Buoy Bar.

35.     The Buoy Bar is approximately 700 feet from the Doerbecker's home, and is

owned by the Doerbecker's neighbor, Roberta Doheny.  Because the Buoy Bar is located in a

quiet residential neighborhood, the owners are concerned generally about neighborhood reaction

to noise associated with the operation of the bar.

36.     On information and belief, Castellano and Kurt confronted one another in the bar;

apparently, Kurt punched Castellano.

7

37.    On information and belief, an employee of the Buoy Bar asked Kurt to leave the bar.

38.    Kurt complied with this request.

39.    Kurt had not finished the beer he had ordered.   Kurt did not appear to be drunk.

40.    On information and belief, Kurt did not believe the incident with Castellano was serious, and he tried to return to the bar on two or three occasions.   Each time he was reminded by an employee of the bar that he was not allowed to return to the Buoy Bar that evening, and each time Kurt walked away without trying to force his way into the bar.

41.    In any event, because Kurt and Castellano had had an altercation inside the bar, and because Kurt had on two or three occasions thereafter walked back to the Buoy Bar, on information and belief Ms. Doheny was concerned that the dispute between Castellano and Kurt might result in an altercation in the parking lot or somewhere else in the vicinity of the Buoy Bar that might prompt complaints from neighbors about noise.  As a result, Ms. Doheny telephoned the NCPD's Fourth Precinct station house.

**C.    Kurt Arranges to Buy a Small Amount of Marijuana**

42.    Kurt on occasion smoked marijuana.

43.    On the evening of August 29, 2011, he made efforts to buy a small quantity of marijuana.

44.    At or around 11:30 pm, Kurt made contact with a teenager who lived nearby Kurt's home and who Kurt understood had marijuana that he would sell.

45.    On information and belief, that teenager is Keith Donnelly, and on August 29, 2011 he lived at 142 Lynbrook Avenue in Point Lookout, just a few hundred feet from the Doerbecker's home.

8

46.     On information and belief, Keith consented to Kurt's entry into his unlocked home on Lynbrook Avenue for purposes of leaving money for Keith there.

47.     On information and belief, Keith's mother was not aware of these interactions between her son and Kurt.

48.     On information and belief, Mrs. Donnelly heard a noise and came downstairs and saw a person in her kitchen she did not recognize, and was very startled, thinking – incorrectly – that the person was a burglar.

49.     As a result, Mrs. Donnelly screamed.

50.     Kurt immediately left her home.  He took nothing, never attempted to take anything, and never brandished a knife, screwdriver or other tool or weapon at Mrs. Donnelly. He did not act menacingly.  Instead, on information and belief, Kurt believed that if Mrs. Donnelly recognized him and asked him what he was doing in the house, it would only get Keith in trouble.  So he immediately left the home on Lynbrook Avenue and went to his own home.

51.     Kurt was in and out of his house earlier that night, but he was in his bedroom at 12:30 am on August 30, 2011, when the phone rang in the Doerbecker home.

**D.     The NCPD's Massive, Military-Style Encirclement of the Doerbecker Home**

52.     Roberta Doheny called the Doerbeckers' home phone at approximately 12:30 am on August 30, 2011.

53.     Mrs. Doerbecker, awakened by the call, got out of bed to answer it.

54.     Either the phone ringing or Mrs. Doerbecker's movements awakened Mr. Doerbecker.

55.     Upon being awoken, Mr. Doerbecker saw high-intensity lights shining through their window and told his wife, who had gotten out of bed, naked, to answer the phone, to get dressed.

56.     Mr. Doerbecker noticed the reflections of night vision goggles in the backyard and saw what appeared to be several NCPD or other County personnel in the backyard.

57.     On the telephone, Ms. Doheny told Mrs. Doerbecker that the police wanted to talk to Kurt.

58.     Mr. Doerbecker went downstairs to answer the front door.  Mrs. Doerbecker followed him downstairs and stood in the living room, approximately 10-15 feet away from the front door of her home, where her husband was standing.

59.     When he opened the door, Mr. Doerbecker saw numerous police cars outside the house scattered on and near Bayside Drive in front of the family's home.

60.     Mr. Doerbecker spoke with an officer who, upon information and belief, was Sgt. Stillman, who began to push his way into the house (crossing the threshold).  Mr. Doerbecker told Sgt. Stillman that unless he had a warrant, he had no right to force his way into the house, and Mr. Doerbecker gently pushed him back onto the front stoop.

61.     Sgt. Stillman demanded to speak with Kurt.  Mr. Doerbecker closed and locked the door and went downstairs to ask Kurt if he would come upstairs.  Kurt refused.  Mr. Doerbecker went back upstairs and told Sgt. Stillman that Kurt did not want to speak to him.

62.     Sgt. Stillman reacted angrily to this information and verbally abused Mr. Doerbecker.

10

63.     Mr. Doerbecker closed and locked the door again and went downstairs a second time to speak to Kurt.  Kurt again refused to come upstairs.  Mr. Doerbecker went back upstairs and told Sgt. Stillman that Kurt was not coming upstairs.

64.     Sgt. Stillman again verbally abused Mr. Doerbecker by, *inter alia,* questioning his manhood because he had been unable to force his 23-year-old son to leave his bedroom and accede to Sgt. Stillman's demand – for which no reason had been supplied – to speak to him.

65.     The aggressive Sgt. Stillman and/or another employee or employees of the County had ordered a massive police response – including numerous squad cars and numerous uniformed and plain-clothed officers using night-vision goggles and shining high-intensity lights into and around the family's home.  This response, like the hostile, arbitrary, and aggressive deportment of Sgt. Stillman, was unjustifiable and out of any reasonable proportion to any predicate the NCPD may have had to suspect Kurt of wrongdoing.

66.     The massive police response intimidated and frightened Mr. Doerbecker and Mrs. Doerbecker.

67.     On information and belief, the aggressive Sgt. Stillman and the massive and unnecessary police response also intimidated and frightened Kurt.

68.     The Doerbeckers continued to attempt to satisfy the aggressive, abusive Sgt. Stillman.  Thus, after his two unsuccessful attempts, Mr. Doerbecker asked Mrs. Doerbecker to go speak with Kurt.

69.     Mrs. Doerbecker went downstairs and convinced Kurt to come upstairs and speak with Sgt. Stillman.

70.     Kurt stood in the kitchen area, wearing clothing he normally wore to bed.

11

71.     Kurt was only a few feet from Sgt. Stillman as Kurt stood in his kitchen, near his step-mother and father.  Kurt spoke to Sgt. Stillman through the closed but unlocked screen door.

72.     Sgt. Stillman again was hostile and intimidating.  He made various threats regarding what he would do to Kurt if Kurt did not walk outside his home and talk to the police.

73.     Kurt responded by saying that he had not done anything wrong.  Kurt asked if the NCPD had a warrant.  Not having been shown or advised of one, Kurt stood on his rights and refused to speak with Sgt. Stillman further.

74.     Kurt then went back downstairs to his bedroom, closing and locking his door from the inside.

**E.      In Retaliation for Kurt and His Parents' Exercise of their Fourth and/or Fifth Amendment Rights, the NCPD Intensified Its Already Overwhelming Police Response**

75.     At or around this time, numerous additional personnel of the NCPD arrived on the scene, including an armored vehicle that pulled up directly in front of and partially upon the Doerbecker's property.

76.     The armored vehicle appeared to be operated by a BSO team.

77.     When Mr. Doerbecker saw the BSO team, he asked Sgt. Stillman what possibly could justify this further intensification of an already massive police response.

78.     Neither Sgt. Stillman nor any other NCPD or County officer or employee had told Mr. Doerbecker, Mrs. Doerbecker, and/or Kurt the purported reason for the massive police response or Sgt. Stillman's invasive, aggressive, inappropriate behavior.

79.     Instead, Sgt. Stillman responded to Mr. Doerbecker's question with an inappropriate, risk-escalating, and chilling retort:  "this is how we deal with people who are uncooperative."

80.     After hearing this threat, Mr. Doerbecker closed and secured the front door to his family's home.

81.     The BSO team began to surround the house.

82.     At this time, there were approximately 60 to 100 members of the NCPD or other law enforcement agencies surrounding the house.

83.     Mrs. Doerbecker was concerned that the BSO team was going to invade her home.

84.     She was afraid for her family, including Kurt, her younger son Albert, and her 86-year-old mother, who was sleeping downstairs in the room next to Kurt's.

85.     As a result, Mrs. Doerbecker went downstairs a second time to see if Kurt would speak to the police.

86.     She knocked on the door, but there was no answer.  She subsequently unlocked the door, and it appeared that Kurt was not in his room.

87.     Mrs. Doerbecker returned to the main level of the home and joined her husband, who was on the front stoop continuing to try to make sense of the overwhelming show of military-style force – tens of patrol cars, tens of uniformed and plain-clothed officers and detectives (some wearing night-vision goggles and wielding high-intensity search lights), an armored vehicle, at least one canine unit, a BSO team, and a manned police boat in the narrow channel that runs behind the family's home – for a still-unstated "reason."

88.     No NCPD or County official, officer, or employee ever sought to supply a rationale for this grossly excessive response until long after a NCPD officer shot repeatedly at Kurt as he was running away from the shooter, finally hitting him with the third shot in the back of the head and killing him.

13

**F.      Officer Berkovits Fatally Shoots a Fleeing Kurt In the Back of His Head**

89.      On information and belief, at approximately 1:30 am, Kurt – undoubtedly afraid that the police might invade his home and harm his family (for example by scaring to death his 86-year-old grandmother with whom he was especially close by barging down to the small basement level they shared) – sought to flee to safety by exiting his room through one of its backyard-facing windows.

90.      On information and belief, Kurt ran toward the beach.

91.      Kurt had a small pocket knife, but it was in his shorts, beneath his jeans, and he never reached for it.

92.      On information and belief, Kurt had a small amount of alcohol and a small amount of marijuana in his blood, but he was not intoxicated.

93.      Officer Berkovits fired at Kurt and missed.

94.      On information and belief, Kurt was now aware he was being shot at and continued to run, now for his life.

95.      Officer Berkovits fired again at the fleeing Kurt.  The second shot also missed Kurt, instead smashing through the sliding glass door and into the dining room of a neighbor with young children who, fortunately, was not home.

96.      Officer Berkovits trained his gun at Kurt a third time.

97.      Kurt was running.

98.      Kurt was not holding, much less brandishing, a kitchen knife or any knife at all.

99.      No officer shouted at Kurt to drop a knife or any words to that effect.

100.      Officer Berkovits pulled the trigger.  The third bullet struck Kurt in the back of his head, with a slightly upward trajectory.

14

101.    That shot, fired at approximately 1:32 am, caused Kurt's death.

102.    At no point at or around this time, or at any time until about 5:30 that morning, did either Mr. Doerbecker or Mrs. Doerbecker know that the police had shot and killed Kurt or indeed that Kurt had been harmed in any way at all.

### G.    After Killing Kurt, the NCPD Schemed to Keep Mr. and Mrs. Doerbecker Out of Their Home, Including by Unlawfully Arresting Each of Them

103.    At or around the time that the police shot and killed Kurt, an NCPD officer, who appeared to be a member of the BSO unit, continued to engage Mr. Doerbecker.  Among other things, he told Mr. Doerbecker that Mr. Doerbecker would be arrested for obstruction of justice if Mr. Doerbecker did not do as Sgt. Stillman directed.  Mr. Doerbecker said he did not believe he had done anything wrong.

104.    At or around this time, Lt. Kelly, Sgt. Hermann, and/or Sgt. Lewis induced Mr. and Mrs. Doerbecker to come out to and/or remain on the front stoop, ostensibly to speak to Sgt. Stillman.

105.    Mr. and Mrs. Doerbecker remained on the front stoop for an extended period of time, during some of which Mr. Doerbecker continued to have verbal interactions with Sgt. Stillman, Lt. Kelly, Sgt. Hermann, and Sgt. Lewis.

106.    Between the time that Officer Berkovits fatally shot Kurt and 1:39 am – and while Mr. and Mrs. Doerbecker were kept engaged on the front stoop by Sgt. Stillman, Lt. Kelly, Sgt. Hermann, and/or Sgt. Lewis – members of the NCPD entered the Doerbecker's home.

107.    Neither Mr. nor Mrs. Doerbecker nor any other person authorized to grant consent to enter the home consented to the NCPD's entry into the home.

108. On information and belief, no warrant had been issued authorizing this entry into the Doerbeckers' home.

109. At or around the time they were on the front stoop engaged with other NCPD officers or agents, neither Mr. nor Mrs. Doerbecker was aware that a member or members of the NCPD were in their home at or around 1:39 am.

110. At or around 1:39 am, a member of the NCPD called a different NCPD officer on the receiving officer's cell phone.  The officer who placed the call did so from the Doerbeckers' home phone.

111. On information and belief, the call was made from the phone located on the main level of the residence, within a few feet of the kitchen.

112. Until long after the dreadful day of August 30, 2011, neither Mr. nor Mrs. Doerbecker had any idea that at least one officer of the NCPD had been in their home at or around 1:39 am that day.

113. At or around 2:10 am on August 30, 2011, with his wife sitting or standing near him on the stoop, Mr. Doerbecker told Lt. Kelly and/or Sgt. Hermann that if no detective or other NCPD official appeared with a warrant by 2:30 am, Mr. Doerbecker was going to go back inside his home and to bed.

114. At or about 2:20 am, Mrs. Doerbecker saw several officers who she thought were trying to gain access to her backyard from the eastern side of the front of the home.  She was in the process of attempting to explain that that side of the house was impassable because the family had stored all their outdoor furniture there in anticipation of Hurricane Irene.

115. As she was attempting to explain this, several NCPD officers (including, on information and belief, Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer Barretti,

Officer Deluca, and/or an as-yet unidentified officer or officers named here in their fictitious "John Doe" capacities) snuck around a van, ran up the front stoop, and grabbed Mrs. Doerbecker.  Though she had done nothing wrong, the officers forced her to the ground, grabbed her phone from her hand, and dragged her down the stairs.

116.    While this abusive arrest was being effected, Mrs. Doerbecker screamed for her neighbor, an attorney, seeking help and legal advice.  Although the lawyer responded by approaching the barricade the NCPD had formed, officers of the NCPD prevented Mrs. Doerbecker from speaking to the lawyer from whom she was attempting to obtain advice.

117.    Being hurled to the ground was not only a psychological shock but also caused Mrs. Doerbecker intense physical pain.

118.    One or more NCPD officers (including, on information and belief, Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer Barretti, Officer Deluca, and/or an as-yet unidentified officer or officers named here in their fictitious "John Doe" capacities) handcuffed Mrs. Doerbecker behind her back.   The cuffs were applied very tightly and caused intense pain and left bruises.  Mrs. Doerbecker was crying in pain and distress.

119.    At or around the same time, approximately five or six NCPD officers (including, on information and belief, Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer Wor, Officer Garofalo, and/or an as-yet unidentified officer or officers named here in their fictitious "John Doe" capacities) charged Mr. Doerbecker and threw him to the ground, causing his head to smash against a metal pipe.

120.    This excessive and entirely unjustified use of force inflicted immediate and intense physical and psychological pain.

121.    After Mr. Doerbecker was thrown to the ground, an officer of the NCPD (possibly Sgt. Stillman, Lt. Kelly, or Sgt. Hermann, Officer Wor, Officer Garofalo, and/or an as-yet unidentified officer or officers named here in their fictitious "John Doe" capacities) rear-cuffed Mr. Doerbecker, applying excessive force and pressure that inflicted immediate pain and left lasting bruises.

122.    The NCPD's arrest of Mr. Doerbecker was entirely baseless, unlawful, and effected with excessive force in any event.

123.    The NCPD's arrest of Mrs. Doerbecker was entirely baseless, unlawful, and effected with excessive force in any event.

124.    The NCPD placed Mr. and Mrs. Doerbecker in the rear seat of separate patrol cars.

125.    Each was held in custody for hours, and the NCPD lied to each about what had happened to Kurt.

126.    At approximately 5:30 am, the NCPD – still retaining each of them in custody – brought Mr. and Mrs. Doerbecker together into a NCPD Mobile Command Unit or similar police vehicle.

127.    Once assembled there, a Detective Donovan told the family that Kurt was dead.

128.    Each of Mr. and Mrs. Doerbecker was devastated.  By way of illustration only, Mrs. Doerbecker – after being taunted by a particularly heartless female NCPD officer, possibly Sgt. Lewis – started vomiting and having diarrhea upon hearing that the infant she had raised to a multi-talented, promising young man had been shot and killed in the family's own backyard.

129.    Defendants' unlawful conduct has changed Mrs. Doerbecker's life for the worse forever.  She remains haunted by recurrent dreams of the military battleground that the NCPD created around her home and the unspeakable consequences of its doing so.

130.    Mr. Doerbecker suffered similar injuries.   He suffers panic attacks on occasion triggered by nothing more than standing on his own from stoop.  He is a stoic man, but the trauma of the events of August 30, 2011 has injected anxiety, panic, and fear into his life, all on top of the devastating loss of his son, Kurt, whom he loved deeply and from whom he expected a long, productive life.

### H.    Pattern and Practice Allegations

131.    Prior to August 30, 2011, there were other incidents of unjustified use of deadly force by NCPD officers, as well as incidents of NCPD officers creating an unnecessary risk of injury or death to third parties through excessive police responses to minor complaints.

132.    On May 13, 2010, a non-threatening woman was shot while hiding in a closet by members of a BSO unit recklessly executing a search warrant.

133.    On February 26, 2011, a cab driver was shot by two off duty NCPD officers. Although the officers initially accused the driver of threatening them, all charges against the driver were ultimately dropped when it was discovered that the NCPD officers had been drinking.

134.    On January 11, 2003, 50 officers from four precincts, including mounted police, highway patrol officers, BSO members, and a helicopter, responded to a routine call about a domestic argument.  This excessive and hyper-aggressive group of officers ultimately assaulted with pepper spray a group of individuals leaving a baby shower nearby.

135.     Defendant Nassau County, by and through its employees, provided grossly deficient training and supervision to NCPD officers, including the Defendants, concerning, without limitation, the use of deadly force and how to respond to reports of low-level wrongdoing, despite having actual and/or constructive notice that officers were improperly trained and violating minimally acceptable police practices.

136.     Defendant Nassau County, by and through its employees, imposed inadequate discipline on officers who engaged in the improper use of deadly force.

137.     Defendant Nassau County, by and through its employees, was negligent and/or reckless in its hiring and retention of NCPD officers, including the Defendants herein.

138.     On November 22, 2011, a written notice of claim was personally served at the Office of the Nassau County Attorney.

139.     On February 13, 2012, depositions were conducted of plaintiffs pursuant to New York Municipal Law § 50-h.

140.     At least 30 days elapsed between service of the notice of claim and the conduct of the 50-h depositions and the filing of the Complaint, and adjustment or payment of the claim had been neglected or refused.

**FIRST CAUSE OF ACTION**
**(Violation of Fourth, Fifth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983)**
**(By Kurt's Estate Against Officer Berkovits)**

141.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

142.     At all relevant times, Officer Berkovits was acting under color of state law.

143.     Officer Berkovits killed Kurt by shooting him in the back of the head with his service weapon.

144.    This shooting was wholly unjustified.

145.    Officer Berkovits did not actually or reasonably fear that Kurt presented an imminent and serious threat to his or any other person's safety.

146.    This shooting constituted an unreasonable and unlawful search and seizure that violated the Fourth and Fourteenth Amendments to the United States Constitution.

147.    This shooting shocks the conscience and constituted an unlawful deprivation of life and liberty interests without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

148.    Officer Berkovits's actions violated clearly established law.

149.    As a direct and proximate result of the unlawful shooting, Kurt's estate has suffered damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Violation of Fourth, Fifth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983)**
**(By Kurt's Estate Against Nassau County)**

150.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

151.    At all relevant times, Nassau County and the NCPD were acting under color of state law.

152.    Nassau County and the NCPD have a policy, custom, pattern, and practice of tolerating excessive and often deadly force by its police officers.

153.    Nassau County and the NCPD have a policy, custom, pattern, and practice of failing adequately to train their police officers with respect to the appropriate use of force, including deadly force.

154.     Nassau County and the NCPD have a policy, custom, pattern, and practice of failing adequately to supervise their police officers with respect to the appropriate use of force, including deadly force.

155.     Nassau County and the NCPD have a policy, custom, pattern, and practice of failing adequately to discipline their police officers with respect to the inappropriate use of force, including deadly force.

156.     The policies, customs, patterns, and practices of Nassau County and the NCPD alleged above were a proximate cause and/or moving force behind the fatal, unjustified, and unconstitutional shooting of Kurt.

157.     As a direct and proximate result of these unconstitutional policies, customs, patterns, and practices, Kurt's estate has suffered damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
#### (Assault and Battery)
#### (By Kurt's Estate Against Officer Berkovits and Nassau County)

158.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

159.     Officer Berkovits killed Kurt by shooting him in the back of the head with his service weapon.

160.     By doing so, Officer Berkovits intentionally made bodily contact with Kurt that was offensive in nature.

161.     By shooting at Kurt repeatedly, Officer Berkovits intentionally placed Kurt in imminent apprehension of harmful contact.

162.     The shooting was wholly unjustified.

22

163.    Officer Berkovits did not actually or reasonably fear that Kurt presented an imminent and serious threat to his or any other person's safety.

164.    At all relevant times, Officer Berkovits was an employee of Nassau County and the NCPD acting within the scope of his employment.  Nassau County and the NCPD thus are liable to Kurt's estate under the doctrine of *respondeat superior*.

165.    As a direct and proximate result of this assault and battery, Kurt's estate has suffered damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Wrongful Death and Conscious Pain and Suffering)**
**(By Kurt's Estate Against Officer Berkovits and Nassau County)**

166.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

167.    By reason of all of the foregoing, the statutory distributees of Kurt's estate sustained pecuniary and non-pecuniary loss resulting from the loss of Kurt's love, comfort, society, attention, services, and support.

168.    Defendants are liable for Kurt's wrongful death.

169.    Kurt experienced severe conscious pain and suffering during the events that preceded the firing of the third, fatal shot, and, on information and belief, after being struck by said shot but before losing consciousness.

170.    As a direct and proximate result of Kurt's conscious pain and suffering and death, Kurt's estate has suffered damages in an amount to be determined at trial

171.    At all relevant times, Officer Berkovits was an employee of Nassau County and the NCPD acting within the scope of his employment.  Nassau County and the NCPD thus are liable to Kurt's estate under the doctrine of *respondeat superior*.

172.    As a direct and proximate result of this assault and battery, Kurt's estate has suffered damages in an amount to be determined at trial

### FIFTH CAUSE OF ACTION
### (Negligent Hiring and Retention)
### (By Kurt's Estate Against Nassau County)

173.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

174.    Nassau County and the NCPD owed Kurt and his statutory designees a duty of care to prevent the shooting.

175.    Under these or similar circumstances, a reasonable, prudent, and careful person should have anticipated that Kurt or someone like him would be injured by Officer Berkovits without justification.

176.    Officer Berkovits was not fit for duty.

177.    Nassau County and the NCPD knew or should have known that Officer Berkovits was not fit for duty.

178.    By hiring Officer Berkovits and training him in the manner in which he was trained, Nassau County and the NCPD knew or should have known that they were subjecting members of the public like Kurt to an unjustifiable and unreasonable risk that they would be injured or killed by excessive force by Officer Berkovits.

179.    Nassau County and the NCPD knew or should have known through the exercise of reasonable diligence that Officer Berkovits posed a significant threat to public safety and welfare.

180.    Nassau County and the NCPD acted negligently in screening, hiring, training, disciplining, and retaining Officer Berkovits.

24

181.    As a direct and proximate result of this negligence, Kurt's estate has suffered damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**(Violation of the First and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 –**
**Deprivation of Familial Association)**
**(By Albert Doerbecker Against Officer Berkovits)**

182.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

183.    Albert Doerbecker was Kurt's natural father.

184.    Albert Doerbecker had a constitutionally protected liberty interest in the companionship of his son Kurt and the preservation of their intimate and private familial relations free from unwarranted government interference.

185.    Albert Doerbecker has a fundamental constitutional right to the companionship of his son Kurt.

186.    The right of a nuclear family to remain together without coercive interference by the government is an essential aspect of recognized familial privacy rights protected by the First and Fourteenth Amendments.

187.    By unlawfully killing Kurt, Officer Berkovits deprived Albert Doerbecker of these protected rights.

188.    Officer Berkovits's conduct was purposefully directed at Albert Doerbecker's relationship with his son. Officer Berkovits used excessive force on Kurt in retaliation for Albert Doerbecker's decision to assert his Fourth Amendment rights and to refuse to allow the NCPD's officers to enter his home.

189.    Officer Berkovits's actions violated clearly established law.

25

190.    As a direct and proximate result of the shooting, Albert Doerbecker suffered

damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
**(Violation of Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 –
False Arrest and Imprisonment)
(By Albert Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer
Wor, Officer Garofalo, and any other "John Doe" officer involved in the arrest)**

191.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth

herein.

192.    The arresting officers intended to and did confine Albert Doerbecker against his

will.

193.    Albert Doerbecker was conscious of this confinement.

194.    Albert Doerbecker did not consent to this confinement.

195.    This confinement was not legally privileged.

196.    The arresting officers did not have a warrant to arrest Albert Doerbecker.

197.    The arresting officers did not have probable cause to arrest or detain Albert

Doerbecker.

198.    No criminal charges were made against Albert Doerbecker.

199.    As a direct and proximate result of this false arrest and imprisonment, Albert

Doerbecker suffered damages in an amount to be determined at trial

## EIGHTH CAUSE OF ACTION
**(False Arrest and Imprisonment – New York Law)
(By Albert Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer
Wor, Officer Garofalo, any other "John Doe" officer involved in the arrest, and Nassau
County)**

200.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth

herein.

26

201. The arresting officers intended to and did confine Albert Doerbecker against his will.

202. Albert Doerbecker was conscious of this confinement.

203. Albert Doerbecker did not consent to this confinement.

204. This confinement was not legally privileged.

205. The arresting officers did not have a warrant to arrest Albert Doerbecker.

206. The arresting officers did not have probable cause to arrest or detain Albert Doerbecker.

207. No criminal charges were made against Albert Doerbecker.

208. At all relevant times, the arresting officers were employees of Nassau County and the NCPD acting within the scope of their employment. Nassau County and the NCPD thus are liable to Mr. Doerbecker under the doctrine of *respondeat superior*.

209. As a direct and proximate result of this false arrest and imprisonment, Albert Doerbecker suffered damages in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
**(Violation of the Fourth, Fifth and Fourteenth Amendments,**
**pursuant to 42 U.S.C. § 1983 – Excessive Force)**
**(By Albert Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer**
**Wor, Officer Garofalo, and any other "John Doe" officer involved in the arrest )**

210. Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

211. At all relevant times, the arresting officers were acting under color of state law.

212. The arresting officers used unnecessary and excessive force on Albert Doerbecker by, among other things, throwing him to the ground and handcuffing him too tightly.

213. This excessive force was wholly unjustified.

27

214. The arresting officers did not actually or reasonably fear that Albert Doerbecker presented an imminent and serious threat to his or any other person's safety, or that the force that was used was reasonably necessary to effect a lawful arrest.

215. This excessive force violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

216. The actions of the arresting officers violated clearly established law.

217. As a direct and proximate result of this excessive force, Albert Doerbecker suffered damages in an amount to be determined at trial, including without limitation physical and emotional injuries.

**TENTH CAUSE OF ACTION**
**(Excessive Force – New York Law)**
**(By Albert Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer Wor, Officer Garofalo, any other "John Doe" officer involved in the arrest, and Nassau County)**

218. Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

219. The arresting officers intentionally made bodily contact with Albert Doerbecker that was offensive in nature.

220. By throwing Albert Doerbecker to the ground and otherwise subjecting him to excessive force, the arresting officers intentionally placed Albert Doerbecker in imminent apprehension of harmful contact.

221. This force was wholly unjustified.

222. The arresting officers did not actually or reasonably fear that Albert Doerbecker presented an imminent and serious threat to his or any other person's safety.

223.     At all relevant times, the arresting officers were employees of Nassau County and the NCPD acting within the scope of their employment.  Nassau County and the NCPD thus are liable to Albert Doerbecker under the doctrine of *respondeat superior*.

224.     As a direct and proximate result of this assault and battery, Albert Doerbecker has suffered damages in an amount to be determined at trial, including without limitation physical and emotional injuries.

### ELEVENTH CAUSE OF ACTION
#### (Violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 – Illegal Search)
#### (By Albert Doerbecker Against Officer Carlson, Sgt. Hermann, and any other "John Doe" officer involved in the search)

225.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

226.     Various NCPD officers, including without limitation Officer Carlson and Sgt. Hermann, entered the Doerbecker's home without a warrant and conducted an unlawful search of the premises.

227.     At the time of the warrantless entry, the police had no reason to believe that exigent circumstances existed posing a threat to the officers or evidence because Mr. and Mrs. Doerbecker were being kept on the front stoop by, and under the close supervision of, officers of the NCPD, and Kurt had been shot in the backyard.

228.     No resident of the Doerbecker home granted consent for the police to enter the premises.

229.     Upon information and belief, the police searched through the Doerbecker's personal belongings once inside the home, despite the absence of any valid reason for them doing so.

230.     As a direct and proximate result of this unlawful search, Albert Doerbecker has

suffered damages in an amount to be determined at trial.

## TWELTH CAUSE OF ACTION
**(Violation of Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 –**
***False Arrest and Imprisonment)***
**(By Marie Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer**
**Barretti, Officer Deluca, and any other "John Doe" officer involved in the arrest )**

231.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth

herein.

232.     The arresting officers intended to and did confine Marie Doerbecker against her

will.

233.     Marie Doerbecker was conscious of this confinement.

234.     Marie Doerbecker did not consent to this confinement.

235.     This confinement was not legally privileged.

236.     The arresting officers did not have a warrant to arrest Marie Doerbecker.

237.     The arresting officers did not have probable cause to arrest or detain Marie

Doerbecker.

238.     No criminal charges were made against Marie Doerbecker.

239.     As a direct and proximate result of this false arrest and imprisonment, Marie

Doerbecker suffered damages in an amount to be determined at trial

## THIRTEENTH CAUSE OF ACTION
**(False Arrest and Imprisonment – New York Law)**
**(By Marie Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt.**
**Lewis, Officer Barretti, Officer Deluca, any other "John Doe" officer involved in the arrest,**
**and Nassau County)**

240.   Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set

forth herein.

241. The arresting officers intended to and did confine Marie Doerbecker against her will.

242. Marie Doerbecker was conscious of this confinement.

243. Marie Doerbecker did not consent to this confinement.

244. This confinement was not legally privileged.

245. The arresting officers did not have a warrant to arrest Marie Doerbecker.

246. The arresting officers did not have probable cause to arrest or detain Marie Doerbecker.

247. No criminal charges were made against Marie Doerbecker.

248. At all relevant times, the arresting officers were employees of Nassau County and the NCPD acting within the scope of their employment.  Nassau County and the NCPD thus are liable to Mrs. Doerbecker under the doctrine of *respondeat superior*.

249. As a direct and proximate result of this false arrest and imprisonment, Marie Doerbecker suffered damages in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION
### (Violation of the Fourth, Fifth and Fourteenth Amendments, pursuant to  42 U.S.C. § 1983 – Excessive Force)
### (By Marie Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer Barretti, Officer Deluca, and any other "John Doe" officer involved in the arrest )

250. Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

251. At all relevant times, the arresting officers were acting under color of state law.

252. The arresting officers used unnecessary and excessive force on Marie Doerbecker by, among other things, throwing her to the ground and handcuffing her too tightly.

31

253.    This excessive force was wholly unjustified.

254.    The arresting officers did not actually or reasonably fear that Marie Doerbecker presented an imminent and serious threat to his or any other person's wellbeing, or that the force that was used was reasonably necessary to effect a lawful arrest.

255.    This excessive force violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

256.    The actions of the arresting officers violated clearly established law.

257.    As a direct and proximate result of this excessive force, Marie Doerbecker suffered damages in an amount to be determined at trial, including without limitation physical and emotional injuries.

**FIFTEENTH CAUSE OF ACTION**
**(Excessive Force – New York Law)**
**(By Marie Doerbecker Against Sgt. Stillman, Lt. Kelly, Sgt. Hermann, Sgt. Lewis, Officer Barretti, Officer Deluca, any other "John Doe" officer involved in the arrest, and Nassau County)**

258.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

259.    The arresting officers intentionally made bodily contact with Marie Doerbecker with excessive force.

260.    The arresting officers intentionally placed Mrs. Doerbecker in imminent apprehension of harmful contact.

261.    This force was wholly unjustified.

262.    The arresting officers did not actually or reasonably fear that Mrs. Doerbecker presented an imminent and serious threat to his or any other person's wellbeing.

263.     At all relevant times, the arresting officers were employees of Nassau

County and the NCPD acting within the scope of their employment.  Nassau County and the

NCPD thus are liable to Mrs. Doerbecker under the doctrine of *respondeat superior*.

264.     As a direct and proximate result of this assault and battery, Marie

Doerbecker has suffered damages in an amount to be determined at trial, including without

limitation physical and emotional injuries.

## SIXTEENTH CAUSE OF ACTION
### (Violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 – Illegal Search)
### (By Marie Doerbecker Against Officer Carlson, Sgt. Hermann, and any other "John Doe" officer involved in the search)

265.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully

set forth herein.

266.     Defendants entered the Doerbeckers' home without a warrant, and

conducted an unlawful search of the premises.

267.     At the time of the warrantless entry, the police had no reason to believe

that exigent circumstances existed posing a threat to the officers or evidence because Mr. and

Mrs. Doerbecker were being kept on the front stoop by, and under the close supervision of,

officers of the NCPD and Kurt had been shot in the backyard.

268.     No resident of the Doerbecker home granted consent for the police to enter

the premises.

269.     Upon information and belief, the police searched through the

Doerbeckers' personal belongings once inside the home, despite the absence of any valid reason

for them doing so.

270.     As a direct and proximate result of this unlawful search, Mrs. Doerbecker

has suffered damages in an amount to be determined at trial.


WHEREFORE, Plaintiffs respectfully request that judgment be entered against

Defendants as follows:

   a.   Awarding compensatory damages in an amount to be determined at trial;

   b.   Awarding punitive damages in an amount to be determined at trial;

   c.   Awarding attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

   d.   Awarding such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       November 26, 2012


By:  /s/ John R. Cuti
        John R. Cuti (JC 3365)
        Eric Hecker (EH 0989)
        Alexander Goldenberg (AG 1128)

     CUTI HECKER WANG LLP
     305 Broadway, Suite 607
     New York, New York 10007
     (212) 620-2602

     *Attorneys for Plaintiffs*